The first case is Patricia Martinez De Artiga v. William Barr, thank you. Good morning, you may proceed. Thank you, Your Honor. Good morning, may it please the court, Rebecca Press for petitioners Patricia Martinez De Artiga and her son, Noe Artiga Martinez, who appealed the denial of their applications for asylum, withholding of removal, and protection under the Convention Against Torture. The facts in this case are not in dispute. Ms. Martinez is a Salvadoran woman, a mother, who stands to be killed because of her efforts to shield her son, who was then only 10 years old, from the MS-13. She stands directly in the line of fire because of her membership in the particular social group of her immediate family and her imputed political opinion. The group was presented below as the immediate family of Noe Artiga Martinez, the son in this case. She stands in the line of fire because of her membership in that particular social group, as well as her imputed political opinion. The judge here failed to consider one of these grounds entirely and committed clear error by ignoring three uncontested and critical facts that established the nexus between her social group and her persecution. The immigration judge held that the MS-13 was motivated to harm Ms. Martinez exclusively because of her interference with their efforts to recruit her son, and in so holding, he overlooked three facts. The first fact is that the gang, in the words, we will kill your family, before Ms. Martinez took any steps to protect him. The second is that of the universe of people who took steps to protect Noe, it was only she who was threatened by the MS-13. And in fact, the judge went beyond that and speculated that other individuals who took similar steps to protect Noe would have been similarly threatened, ignoring the uncontested record evidence that there were people who took steps to protect him who were unrelated to him and were not threatened. Were you also seeking relief under the Convention Against Torture? We are, Your Honor. Yeah, because, you know, there are many problems in what is a protected social group, but it seems to me that here, the question of what is torture and what is enough to show torture is one of the things that is really fundamentally at issue. Would you speak to that? I agree with that, as I think you can tell from my brief. In this, the error that the judge made in this case was he placed entirely too much weight on the number of times that Ms. Martinez-Zeratiga and her children were threatened, as well as the fact that they did not suffer any physical harm. But he did that without considering who was making the threats and the credibility and likelihood that they would act on those threats. Well, what are you supposed to do, hang around until they actually kill you to get more threats? I would hope not, exactly. I would know... They showed her weapons, didn't they? I'm sorry? They showed her weapons? They did. They brandished knives when they threatened her in person, and again when they threatened her daughter after her departure. Afterward. And they found her credible, didn't both levels of review find that? Did they find Ms. Martinez-Zeratiga credible? Yes, Your Honor, that's correct. As such, the facts are not in dispute. That's correct. I would go back to the asylum argument, though, for a moment, because this court has told us in Mendez v. Holder that the agency commits an error of law by overlooking facts important to the proper application of legal standard, and here the legal standard that was improperly applied was the one central reason legal standard. It is impossible that the judge properly applied this standard because he failed to consider evidence that, in fact, supports Ms. Martinez-Zeratiga's claim that the MS-13 was motivated, at least in part, by her status as his mother. But isn't the government's argument fairly plausible here, that what was going on was not because it was part of a family, but because they wanted to go after people who were resisting their recruitment, and that that's not a protected social group? Sure. Well, I think the government's argument is, another way to phrase that is that this was a means to an end, that they were targeting her so that Noe would be forced to join their gang. But in concluding that, they overlook these facts that I outlined before, that she was targeted before making efforts to protect him, that she was targeted in a way significantly different than others who did also try to protect him, and that the family continued to be singled out for persecution following her departure from the country. These facts demonstrate that in addition to the motive of resisting recruitment, something else was also going on, and that something else was her membership in her particular social group of her family. And it is only by overlooking those facts that the agency could have concluded that there was only one motivating factor. In the briefs, I discuss a number of cases decided by the Fourth Circuit and the Fourth and the Seventh, because those courts of appeals apply the one central reason standard, just as this court does. They require that the central reason not be tangential, incidental, superficial, or play a minor role, and we get that language from the Board of Immigration Appeals. And the Fourth and the Seventh have considered cases with identical issues, where a mother tried to protect her son from forced recruitment, or a husband tried to protect his wife from being targeted because of his relationship. And in those cases, the Fourth and the Seventh talk about this idea of an excessively narrow understanding of one central reason. Hasn't there been more development at the BIA on this issue since these Fourth and Seventh Circuit cases? Yes, Your Honor, there has. The two cases have been decided since Hernandez-Avalos, which is the Fourth Circuit case, both called matter of LEA, LEA-1 and LEA-2. The latest case decided by the Seventh Circuit was just before LEA-2, which was not decided by the Board, but decided by the Attorney General. Turning in the moments remaining to the Catt claim, you would have to show, or whose burden is it to show that the government would acquiesce and not protect Ms. D'Artega? It's the applicant's burden. So the individual seeking humanitarian protection. But there were no findings of fact made on that issue, were there? There were not. So if we were to agree with you on the Catt, and let's say not the other, then the government acquiescence? I believe so, but I would suggest remanding with instructions that get to the issue of likelihood, because both likelihood and acquiescence are important to determining whether somebody is eligible for this humanitarian protection. And the error committed by the judge in this case gets to likelihood rather than acquiescence. Of course. Thank you. We reserve two minutes for rebuttal. We'll hear from the government. Thank you, Your Honors. May it please the Court, my name is Evan Schultz. I represent the government. I'd like to start with possibly the issue that's concerning you the most, which is the Convention Against Torture, from what I just heard. I think the only thing to keep in mind on this issue is the standard of review, which is that this is going to be decided under the substantial ---- Let me say one thing here. Yes, Your Honor. The government asked for a summary affirmance in this case. Now, no, it isn't your fault, but I must say I am extremely troubled by a case which is as complicated as this. Your position on the torture may be the winning one and on everything else, but to treat this case as a summary case seems to me really extraordinary. So just by way of information, here is one judge who says, let these cases be tried out fully, as has happened here. We actually went from a NAC panel to a RAC panel, but to treat them as summary affirmances is really troubling. I understand, Your Honor. Thank you for mentioning that. On the actual merits of the case, given where we are now on the full merits, again, the standard of review is substantial evidence, which is a very steep climb for the Petitioner. Well, the judges who heard from this Petitioner found her credible. She ---- that's correct, Your Honor. There's no question about credibility here. The immigration judge was quite clear about that. Which means we have to take as true what she said about being threatened, being shown weapons, the things that were said to her, correct? That's absolutely correct, Your Honor, but the question is whether or not that's enough. Now, looking specifically at the facts. Whether as a matter of law, it is enough to be ---- to show the likelihood of torture when somebody says, I will kill you and your son, and thereafter they say, I will rape your daughter and rip her unborn child from her womb, and these people then leave before anything else happens, whether that is enough to show a likelihood of killing, which we have treated as the equivalent of torture. That's the question, isn't it? The killing is the equivalent of torture, Your Honor, but not a threat and not an unfulfilled threat. Now, you're correct, Your Honor, as you said before. People don't need to wait around, but I think it's important to look at the context here. El Salvador is in the midst of an ongoing wave of crime that is tragic, that is devastating, but that is not by definition meaning that everyone in the country who has a threat from a gang member has reached the standard for cats. If you look what the judge said here, the immigration judge, he emphasized that there are other relatives to Noe, the son, and to the petitioner, Ms. Martinez, who have continued to live in El Salvador. The older sister, Angie, and the mother of Ms. Martinez, Ms. Blanca Martinez, continue to live there, and there's nothing in the record indicating that they have been killed    or that they were harmed. But they weren't even threatened. Would it make any difference on the issue of torture if when they threatened this petitioner, they had also slapped her? How would that increase the likelihood of torture? Because the IJ did go on the fact that there was no physical, but I'm just trying, realistically, what is it that makes it likely that a certain event will happen, and how does the nature of the threat, repeated then to the daughter, as against whether there was any physicality? That's what I'd like you to address, because that seems to be the two parts of what the IJBIA position are. One, that it wasn't repeated, that it was just one threat, and that she took off at that. And the other, that there was no physicality. And I'm trying to get what the link to that, to likelihood of torture, is. I have a couple of responses to that, Your Honor. I don't think a slap by itself would be enough, but at some point there would be enough. You're absolutely right about that. The line isn't necessarily always laid out clearly in the precedent, but when there's a mere threat, like what we had here, that's not enough. I think it's also important to look at the larger cultural phenomenon going on in this case, specifically with the people who were involved here. Angie, the older daughter, said that criminality increases day by day. Noe, he said that in his written statement, in her written statement. Noe, the son, said in his written statement that other people received the same sorts of threats that he received. These are not, as tragic and heart-rending as these incidents are, these are not anything that are so unique, where a mere threat can end up turning into a likelihood, especially given the substantial evidence standard. Your Honors, I have about four minutes left. I would like to briefly address the asylum issue, if I may. I would like you to address one other thing. Yes, Your Honor. And that is the question of acquiescence, because it seems to me that some of the things that you are saying really go to whether the government acquiesces or not. That is, whether this is general criminality and that the government is doing what it can and it isn't doing very much, which is enough to bar the torture thing, as against a situation where it is the government that is doing that. That is, I think that that may be a better line, but I may be wrong. I think that the lack of physicality here actually goes to the severity of threat rather than to the acquiescence, and that alone is sufficient, especially under the substantial evidence review standard. On asylum, I would like to point out one thing so that we can focus in on precisely what was done here. Ms. Press, when she argued, said that the threats were made to the mother even before she had resisted. Again, I want to point to what happened to the other students. Noe, the son, said that other students received the exact same sorts of threats that he received. These are threats that actually led the principal to flag that two other students had been threatened, and then to lead to a shutting down of the school or a meeting about the school, I should say. Ms. Martinez herself testified that everyone in the town was scared, whether they had children or not. This was something that was rampant and has no limiting factor based on the nuclear family of the son. Given the threat that was made to Ms. Martinez herself, and this is one factor I really do want to emphasize, in the entire immigration court proceeding, there's only one spot in the record where Ms. Martinez testified about what the people in the gang told to her when they threatened her. I want to read those words. They're at page 124 of the record, but I'd like to take just a moment to read them here. This is on exam from her own lawyer. Answer. Question. So you said that the gangs started with you. Can you explain what you mean by that? Answer. So I left my house, I was heading to work, and they were waiting for me. They stopped me, they told me that they knew I was protecting Noe, and that they were going to kill me. Question. Did they say anything else? Answer. Yes. They told me they're going to kill me because I was protecting Noe. That's the it. That's it. That's the best evidence we have of what the gang members told her when they threatened her. And as this court said in the Acaria case, which Judge Pooler wrote, that is the best evidence that we can have of the intent of a persecutor. Very briefly, the other issue, which hadn't yet come up, is the issue of political persecution. As we argued in our briefs, that was not sufficiently raised to the immigration judge. In the multiple opportunities that Ms. Martinez's lawyer had to flag the issue in his closing argument and the later submission in writing, he did not mention political opposition under this Court's precedent. I have a technical question. Yes, Your Honor. Suppose we were to decide against you on the torture. Yes, Your Honor. And send back for a question of whether there is acquiescence and say that's a question of fact that can't be decided by the BIA but must go back to VIJ. Yes, Your Honor. Would, at that point, the issue of political persecution be raisable? As a general matter, at that point, the petitioners can raise whatever issue they think are relevant. So that issues that they have forfeited now would be able to be raised in an earlier term. Fortunately, from the government's perspective, the government, as we argued before, especially under the standard of review, thinks that the torture or your conclusion was decided correctly. I see my time has expired. Thank you. If you have other questions. Thank you, Your Honors. We'll hear from Ms. Press for two minutes. Thank you. A number of things, Your Honor. First of all, we obviously disagree with regards to the standard of review. As we have repeatedly said, the facts in this case are undisputed. This Court has repeatedly held that the application of legal principle to undisputed fact is review de novo. That asylum and CAT applications require a fact-specific analysis, do not insulate them, do not insulate the questions of law from de novo review. So we believe that the proper standard of review is de novo. With regards to whether we waived our political opinion claim or not, we vehemently disagree. The agency has decided in two cases, one in 2018 called Matter of W.Y.C. and H.O.B., that an asylum applicant is required to provide, quote, clear indications of which enumerated grounds she relies upon in seeking relief. We provided those clear indications by marking the box on the asylum application and by providing testimonial and documentary evidence that support our political opinion claim. The reason we have a record before this Court is because we provided documentary evidence that support the claim. The reason this Court can even get to the question is because the record supports this claim, indicating that we clearly raised it. We also fully developed it before the Board of Immigration Appeals, and not only did they decline to address it, but they did not in any way suggest that we had waived the argument. So to suggest that we've waived it now is, I think, misplaced in terms of what our own agency precedent has told us. With regards to, I'm sorry, with regards to CAT, Mr. Schultz has spent some time talking about generalized violence and that El Salvador finds itself gripped in a context of generalized violence. This in no way undermines Ms. Martínez de Artigo's claim to CAT or to asylum. She fled her country after facing individualized threats. The status of generalized violence had long preexisted her individualized threats, and it was only when she knew that her life and the life of her child was in grave danger that she fled. I have another kind of, opposing counsel has said that if the matter is sent back for CAT reasons with facts to be developed in the district court, then you can make any other arguments. Does that mean that you could bring in additional evidence as to social group? It sounds to me as if it once goes back, even if we are doubtful about whether you have laid out that case, you would then have an opportunity to bring in more evidence that this was not recruitment but social group. That is my belief, Your Honor. My apologies. This court has actually decided a case that gets to this issue, and I cannot remember the name of it at the moment, but this is a point that we agree on. If the case is remanded, excuse me, to the immigration judge, at that point we can engage in further development of the record. Thank you. Thank you both. Thank you both. Well argued by both sides. I'm sorry, I can't hear unless you're in the microphone. I apologize. May I make one quick clarifying remark? I realize it's out of the normal. Ordinarily we don't allow it, but you can take a minute. Even less than that. On the point about what may be raised on if this case is remanded, I just wanted to clarify that. The Petitioner may request the ability to raise that, whether or not it is or isn't allowed will ultimately be up to the immigration judge, but it can be, my understanding is that it can be put forward too. Thank you. Thank you both.